### FRANTZ S. BISHOP v. E. A. GLAZENER.

(Filed 6 March, 1957.)

**1. Husband and Wife § 26—**

A cause of action for alienation of affections exists in this State when a third party, by wrongful and malicious conduct, causes one party to a marriage to lose the affection or consortium of the spouse.

**2. Same—**

When there has been no adultery, seduction or improper relationship, malice constituting an essential part of an action for alienation of affections need not be express malice, but may be implied from intentional, unjustifiable and wrongful conduct.

**3. Same—**

A third party's wrongful conduct need not be the sole cause of the alienation of affections of a spouse in order for him to be liable to the injured party, but it must be the controlling or effective cause, even though there may be other causes.

**4. Same—**

A parent of one spouse, when sued for alienation of affections by the other, occupies a markedly different situation from that of a stranger or

unrelated third person, and the parent may be held liable only for conduct which arises from malice or other improper motive, with the presumption being that the parent acted in good faith and for the child's welfare.

**5. Husband and Wife § 29—**

Evidence tending to show that plaintiff's father-in-law lived in the home, that as a result of recurring friction, plaintiff asked him to leave, that the father-in-law left, remarking, "I will ruin your home," that thereafter the wife visited her father daily and separated herself from her husband some two months thereafter, without evidence of any action by the father-in-law in execution of his threat or any conduct on his part which in fact caused the wife to separate herself from plaintiff, *is held* insufficient to overrule his motion for nonsuit in an action for alienation of affections.

APPEAL by plaintiff from *Froneberger, J.,* October Term 1956 of TRANSYLVANIA.

Civil action by plaintiff against his father-in-law for alleged alienation of his wife's affections.

From a judgment of involuntary nonsuit entered at the close of plaintiff's evidence, plaintiff appeals.

*Redden & Redden and Thomas R. Eller, Jr., for Plaintiff, Appellant.*
*Potts & Ramsey and J. Y. Jordan, Jr., for Defendant, Appellee.*

PARKER, J.   Plaintiff is now 50 years of age; his wife 43.   In 1939 plaintiff was working in a filling station at Saluda, North Carolina, and there met his wife, a daughter of defendant, who at that time was a teacher in the Saluda Public Schools.   They were married on 8 March 1941, and have two children; a boy, now twelve, and a girl, now six.   At the time of the marriage defendant's daughter was living with him in his home in Rosman, North Carolina, and working at the Ecusta Paper Plant at Brevard, North Carolina.   After the marriage plaintiff and his wife lived in his father-in-law's home in Rosman for about seven years, and during this time plaintiff paid about half of the bills.   Mrs. Bishop resumed teaching in January 1942, and continued to do so, until a short time before the first child was born 17 January 1944.   About two years thereafter she resumed teaching in the public schools of the county, and continued to do so until she and plaintiff separated in 1954.   While living in Rosman, plaintiff was employed by the Ecusta Paper Plant. Plaintiff testified, "Mr. Glazener (the defendant) told me I had a job at Ecusta; he may have helped get it for me."   Plaintiff has worked at this plant since then.

Both were working, they had two small children, and they employed a housekeeper, while the mother taught school.

In 1949. plaintiff bought a lot on Carolina Street in the Town of Brevard, and built thereon a house. His wife paid a small part of the cost of construction of the house. The house had a $2,500.00 mortgage on it. He and his wife lived in this home with their children until their separation 17 September 1954. Since then they have lived apart.

When the house was built in Brevard, plaintiff invited the defendant, his father-in-law, to come and live with them in the house, which invitation he accepted. They used in the house two beds, several chairs and a refrigerator belonging to the defendant. Plaintiff bought the rest of the furniture. The defendant paid $100.00 for concreting the basement in the house and $350.00 for installing a furnace therein. The defendant paid $50.00 for screening the house, he bought the concrete blocks for a garage, and he paid $25.00 or $30.00 for the construction of a driveway. Defendant loaned plaintiff $100.00 to install a sewer line, which plaintiff has not repaid, because defendant owed him for venetian blinds left in the home at Rosman worth $100.00. While they were living together at Brevard, defendant bought "a deep freeze" for the house, a hindquarter of beef, a ton or two of coal, paid the electric bill for one year and eight months, and worked in their garden. Defendant lived in this house with plaintiff and his wife for five years. Plaintiff paid the bills, though defendant spent some money on the house.

During the five years the defendant lived in plaintiff's house in Brevard, difficulties and "clashes of opinion" developed between them. Plaintiff testified, "it was my house and he (the defendant) would set up the standard way I should live and expected me to take orders from him, and I didn't like it. . . . He never did like the way I ran things, he wanted to run them." Defendant was constantly cursing in the presence of the children. Plaintiff did not like it, and remonstrated with the defendant about it. They had arguments about the defendant trimming the shrubbery on the lot. Defendant in the daytime played the radio very loud, walked through the house "like a horse," and raked and sawed under plaintiff's bedroom, when plaintiff was trying to sleep, after working on the night shift. They had arguments about defendant putting trash on an adjacent lot. In July 1954 plaintiff saw the defendant with a big bucket, and asked him, "have you been dumping trash and stuff on that man's lot?" Defendant said, "I will do as I please." Plaintiff replied, "If you can't do what I want around here, you can get your things and leave." Defendant replied, "I will go, but I will ruin your home." Defendant moved out, and went to live in the Lawrence Apartments in Brevard.

While defendant was living in plaintiff's home, he made disparaging remarks about plaintiff to Lawrence Hipp, a neighbor. He told Hipp, "Frantz Bishop was so damned contrary nobody could get along with

him, and he didn't see why his wife stayed there with him. . . . he would get up and leave, take off." Defendant also made uncomplimentary and profane remarks about plaintiff to other neighbors.

Mrs. Bishop and her children continued to live with plaintiff in their home from the time her father left in July 1954 until they separated 17 September 1954. During this time Mrs. Bishop visited her father nearly every day. About a week or two after defendant left, Mrs. Bishop brought suit against her husband for alimony, while living in the house with him. Plaintiff begged his wife not to leave him. She replied, "if my father cannot live here, I won't." On 17 September 1954 Mrs. Bishop and the children left their home and went to the Lawrence Apartments to live.

After leaving Mrs. Bishop brought another suit against her husband for support. This suit was heard in Hendersonville, and resulted in a separation agreement, which was signed 22 September 1954, in which plaintiff sold their home to his wife for $4,000.00, which her father paid. The separation agreement is not in the Record. On 1 October 1954, after the sale, plaintiff vacated the house, and Mrs. Bishop, her children, and her father moved in. Mrs. Bishop and the children lived there, until 24 August 1956, when she moved to South Carolina "to improve her B Certificate" as a teacher. She is now there with her children and father.

After defendant left the Bishop home, a sister of plaintiff had a conversation with Mrs. Bishop, and asked her to stay with the plaintiff and keep the home together. Mrs. Bishop replied, "if my father can't stay here, I won't." Plaintiff's sister told her she cared more for her father than she did for her husband, and she said that was her business.

Plaintiff testified: "At the time I married my wife, I was in love with her, and she was in love with me. We lived together in peace and happiness in our home until the time of the separation. My wife showed affection for me all during that time, and I showed affection for her. . . . Since our separation my wife has shown no affection for me whatever and no love for me whatever. . . . I would like to have her back. I still love her." Plaintiff further testified he gave his wife no cause to leave.

The existence of a cause of action for damages in favor of a husband against one who wrongfully and maliciously alienates the affections of his wife depriving him of his conjugal rights to her consortium has long been recognized in England and this country. This is a fundamental common law right. *Barbee v. Armstead*, 32 N.C. 530, 51 Am. Dec. 404; *Cottle v. Johnson*, 179 N.C. 426, 102 S.E. 769; *Rose v. Dean*, 192 N.C. 556, 135 S.E. 348; 27 Am. Jur., Husband and Wife, sec. 522.

The essential elements of an action for alienation of affections are the marriage, the loss of affection or consortium, the wrongful and

malicious conduct of the defendant, and a causal connection between such loss and such conduct. *Cottle v. Johnson, supra; Rose v. Dean, supra; Hankins v. Hankins,* 202 N.C. 358, 162 S.E. 766; *Ridenhour v. Miller,* 225 N.C. 543, 35 S.E. 2d 611; 27 Am. Jur., Husband and Wife, secs. 523 and 524; 42 C.J.S., Husband and Wife, sec. 663.

*Rose v. Dean, supra,* was an action for damages for alienation of the affections of plaintiff's wife. The Court said: "The basis of the action is the husband's loss of the society, affection, and assistance of his wife, and if there is no element of seduction or adultery, malice must be shown; but 'malice' as used here means unjustifiable conduct causing the injury complained of."

It seems to be the general rule, at least in cases where there has been no adultery, seduction or improper relationship, that malice is an essential element of the action for alienation of affections, but malice, as used in this class of cases, does not necessarily mean express malice; an intentional, unjustifiable and wrongful alienation being sufficient from which to imply the requisite malice. 42 C.J.S., Husband and Wife, sec. 662; 27 Am. Jur., Husband and Wife, sec. 527.

The wrongful and malicious conduct of the defendant need not be the sole cause of the alienation of affections. It suffices, according to the rule in a large majority of the cases, if the wrongful and malicious conduct of the defendant is the controlling or effective cause of the alienation, even though there were other causes, which might have contributed to the alienation. Anno. 19 A.L.R. 2d, sec. 6, p. 500 *et seq.,* where the cases are cited; 27 Am. Jur., Husband and Wife, p. 129.

Manifestly, if the affection of the wife was destroyed by the habits and conduct of the husband, or other cause, without the malicious interference or procurement of a third person, then such third person would not be liable. *Hankins v. Hankins, supra.* It is fundamental to a recovery against a third person that the alienation of affections resulted from his malicious interference. Anno. 108 A.L.R., pp. 426-7, where many cases are cited; Anno. 19 A.L.R. 2d, pp. 471-509, Element of Causation in Alienation of Affections Action.

When a suit for alienation of affections is brought by one spouse against the parent of the other, the parent occupies a markedly different situation from a stranger or unrelated third person in these matters. The law recognizes, respects and protects not only the marital relation, but likewise the natural affection between parent and child. The parent does not in the eyes of the law become a stranger by reason of the child's marriage. *Brown v. Brown,* 124 N.C. 19, 32 S.E. 320; *Johnston v. Johnston,* 213 N.C. 255, 195 S.E. 807; *Monen v. Monen,* 64 S.D. 581, 269 N.W. 85, 108 A.L.R. 404; *Glatstein v. Grund,* 243 Iowa 541, 51 N.W. 2d 162, 36 A.L.R. 2d 531; Anno. 108 A.L.R., p. 421; 27 Am. Jur., Husband and Wife, sec. 529.

*Johnston v. Johnston, supra,* was an action'by a daughter-in-law against her mother-in-law for alienation of her husband's affections. The Court said: "Times of stress, with their attendant solicitude on the one hand and desire for aid on the other, naturally bring parent and child together for counsel and advice. This the law condones and does not condemn. Its one requirement is good faith."

In *Brown v. Brown, supra,* it is said: "There are laws of natural affection and of natural duty, and municipal law will not obstruct their free operation as long as they are not abused. The presumption in fact and in law in all such cases must be, and is, that the parent will act only for the best interest of the child and for the honor of the family." It seems to be the general rule, that when parents advise or interfere in the marital relationships of their children, such conduct is presumed to be in good faith and for the child's welfare. Anno. 108 A.L.R., p. 413 *et seq.,* where cases are cited from 27 states, including our case of *Brown v. Brown.*

In *Woodhouse v. Woodhouse,* 99 Vt. 91, 130 A. 758, the Court said: "The law recognizes the natural solicitude of the normal parent for the welfare of his child, and accordingly indulges the presumption that in his influence, association, and conduct with the child he is acting within his rights. No inference of malice will flow from the mere fact of parental interference in the marital relations of a child. In such cases the proof must go further and show that such interference was without just cause or excuse; in other words, was malicious." To the same effect see cases cited Anno. 108 A.L.R., p. 422.

It is settled law that a parent may advise and assist his or her child in respect to the latter's marital relations without liability to the other spouse for alienation of affections, although separation results, provided such advice and aid were in good faith, based on a reasonable belief that the child's welfare makes them necessary, and were not from malice or other improper motive. But the law will not tolerate a parental malicious interference in the child's marital relations, and when such unjustified interference is proved, the parent is liable in an action for alienation of affections, like any other person. *Johnston v. Johnston, supra; Monen v. Monen, supra; Glatstein v. Grund, supra; Woodhouse v. Woodhouse, supra;* Anno. 108 A.L.R., p. 410 *et seq.,* and p. 419 *et seq.;* 15 Va. Law Rev. 94; 42 C.J.S., Husband and Wife, sec. 681; 27 Am. Jur., Husband and Wife, sec. 529.

The *quo animo* is the vital consideration where parents are charged with alienating the affections of a child. "The rights of parents end at the border of good faith." *Johnston v. Johnston, supra.*

The facts in *Hankins v. Hankins, supra,* cited in plaintiff's brief, are far different from the facts here. In that case there was evidence that the "defendant had inquired of his son (plaintiff's husband) if there

was no way to upset the marriage, and that he advised his son to throw the plaintiff out of his life."

During the five years that defendant lived with his son-in-law in the house at Brevard, difficulties and "clashes of opinion," to use plaintiff's phrase, developed between them, which finally culminated in July 1954 with the plaintiff telling the defendant, "if you can't do what I want around here, you can get your things and leave." Defendant replied, "I will go, but I will ruin your home." Defendant's statement "I will ruin your home" seems not to have been executed, because a careful examination of all the evidence fails to disclose any evidence tending to show any conduct or words of the defendant, which in fact alienated the affections of plaintiff's wife, or caused her to separate herself from plaintiff, and to continue to live separate and apart from him.

The fact that plaintiff's wife visited her father daily after he left, and on 17 September 1954 moved into the apartment where he was, and has since lived with him, is not sufficient to show that he alienated her affections from plaintiff or caused the separation, in view of relationship of father and daughter existing between them. *Ridenhour v. Miller, supra; Townsend v. Holderby*, 197 N.C. 550, 149 S.E. 855.

After defendant left plaintiff's home in July 1954, plaintiff's wife and two children lived in the home with him until 17 September 1954. During that period it would seem that plaintiff was not properly supporting his family, because his wife, while living in the home with him, brought a suit for alimony. After she separated from him on 17 September 1954, she brought another suit against him for support, which ended in a separation agreement.

Plaintiff's evidence shows that his wife told him and also his sister, if her father could not live in the house with them, she would not live there. Plaintiff testified, he had lost the affections of his wife, and she had separated herself from him. One can speculate that this was caused by his ordering her father to leave his home, unless her father did what he wanted him to do around the home, or that his conduct to his wife caused this, or that his wife loved her father more than she did him, and would not live apart from him. Be this as it may, a consideration of all the evidence, which we accept as true and consider in the light most favorable to plaintiff, fails to show any wrongful and malicious conduct on the part of the defendant tending to establish liability against him, under the principles of law before set forth.

Affirmed.