HAYWOOD A. CANNON v. JEFFREY L. MILLER

No. 833SC908

(Filed 4 December 1984)

1. Husband and Wife § 28— criminal conversation—sufficiency of evidence

The trial court erred in entering summary judgment for defendant in an action for criminal conversation where plaintiff's forecast of evidence tended to show acts of sexual intercourse by defendant with plaintiff's wife between the time of the separation and the divorce of plaintiff and his wife, and defendant failed to present evidence showing his lack of sexual intercourse with plaintiff's wife during such time.

2. Husband and Wife § 24— alienation of affections—summary judgment improperly granted

Summary judgment was improperly granted for defendant on plaintiff's claim for alienation of affections where the parties presented conflicting forecasts of evidence with respect to whether a genuine love and affection existed between plaintiff and his wife and whether the loss of this love and affection was caused by defendant's conduct.

3. Husband and Wife § 26— alienation of affections—compensatory and punitive damages

Plaintiff's forecast of evidence showing adultery in his action for alienation of affections was sufficient evidence of "malicious conduct" to support a recovery of compensatory damages, and his forecast of evidence that defendant became involved with plaintiff's wife with knowledge that she was married to plaintiff and had a small child, and that defendant persisted in this conduct after plaintiff confronted defendant and attempted to discourage him from pursuing plaintiff's wife was sufficient to raise an issue as to punitive damages.

4. Husband and Wife §§ 24, 27— alienation of affections—criminal conversation— actions judicially abolished

There is no longer any legal or logical basis for the retention of the causes of action for alienation of affections and criminal conversation, and these tort actions are, therefore, abolished.

APPEAL by plaintiff from *Bruce, Judge.* Judgment entered 28 March 1983 in Superior Court, PITT County. Heard in the Court of Appeals 11 May 1984.

On 14 September 1982, the plaintiff, acting *pro se*, instituted this action against the defendant, a licensed attorney, for alienation of affections and criminal conversation, seeking actual and punitive damages for each alleged cause in the total amount of $250,000. Essentially, the complaint alleged that the plaintiff, Haywood Cannon, and Rachel Beaman were married in May of

1975, had one child born in November of 1978 and lived together as husband and wife until January 1980. The Cannons were subsequently divorced on 20 May 1981.

In support of his first cause of action for alienation of affections, plaintiff alleged the following: In May of 1979, his wife became employed as a Deputy Clerk in the Pitt County Courthouse. The defendant is an attorney practicing law in and around Pitt County and he became acquainted with plaintiff's wife sometime during the summer of 1979. In late September or early October of 1979, the defendant persuaded the plaintiff's wife to have sexual relations with him; this "affected the will" of plaintiff's wife and caused her "to transfer her love, loyalty and devotion from this plaintiff to the defendant" and by mid-October 1979, the influence was so strong that plaintiff's wife showed an "obvious loss" of the genuine love and affection that had existed during the marriage until that time.

In support of his second cause of action for criminal conversation, plaintiff alleged that on numerous occasions prior to 20 May 1981, defendant and plaintiff's spouse had sexual intercourse. Both causes of action were supported by allegations detailing the various injuries suffered by plaintiff as a result of the alleged wrongful behavior of the defendant and plaintiff's wife.

The defendant filed preliminary motions to dismiss, to strike, and for summary judgment. In support of his motion to dismiss, defendant contended that the causes of action were unconstitutional under the state and federal constitutions, or in the alternative that they were violative of the public policy and laws of North Carolina. Accompanying defendant's motions were three supporting affidavits and two exhibits, consisting of two prior court orders entered in connection with the Cannons' divorce proceedings. Together, these documents tended to show that the Cannons were not happily married; that they had permanently separated as of 15 October 1979; and that defendant only became acquainted with Mrs. Cannon after their separation.

Plaintiff promptly filed a response to the motion for summary judgment, contending *inter alia*, that defendant had failed to respond to the cause of action for criminal conversation. In addition, plaintiff filed his own affidavit which flatly contradicted the factual assertions in defendant's affidavits.

On 17 January 1983, defendant's Rule 12 motions were heard and denied, and his motion for summary judgment was continued until 28 March 1983. On 20 January 1983, the defendant filed an answer and counterclaim, making general denials of all allegations and claiming defamation and abuse of process on the basis of the allegations in plaintiff's complaint. Various discovery requests and pre-trial motions were thereafter filed by each party. On 21 March 1983, plaintiff's motion to continue the summary judgment hearing was denied, as was the defendant's motion to dismiss plaintiff's causes of action.

The trial court ruled on defendant's motion for summary judgment on 28 March 1983. The order states:

> The court has reviewed the entire court file in this cause, other court files involving the plaintiff and his former spouse, all of the Affidavits filed herein, and further has heard extensive argument offered both by plaintiff, on his own behalf, and by defendant's counsel.

> Upon the foregoing, the court finds that there is no genuine issue of fact upon either the cause of action of alienation of affection or criminal conversation prior to October 15, 1979, and that defendant's motion for summary judgment should therefore be granted.

The plaintiff excepted and appeals from the order granting summary judgment in favor of defendant, and the defendant has cross-assigned error and appeals the denial of defendant's motions to dismiss the plaintiff's causes of action.

*Haywood A. Cannon, pro se, for plaintiff appellant.*

*Dallas Clark, Jr.; and James M. Roberts, by James M. Roberts and Jeffrey L. Miller, pro se, for defendant appellee.*

JOHNSON, Judge.

The plaintiff's appeal presents the question of whether the trial court erred in granting summary judgment in favor of defendant on the plaintiff's claims for alienation of affections and criminal conversation. The defendant's appeal primarily raises the question of whether these causes of action, sometimes referred to as "heart balm" torts, should be judicially abolished in this

jurisdiction. Because we are of the opinion that summary judgment was erroneously entered in favor of the defendant, we must also address the question presented by the defendant. For the reasons set forth below, we conclude that there is no longer any legal or logical basis for the retention of the causes of action for alienation of affections and criminal conversation and that these tort actions should, therefore, be abolished in this jurisdiction. We first address the plaintiff's appeal.

## I

Plaintiff has presented a number of procedural questions for review, however, we need not address these in light of our ultimate disposition of this appeal. Therefore, we turn directly to his substantive contentions.

The plaintiff contends that the trial court erred in granting summary judgment in favor of defendant because the evidentiary forecast disclosed the existence of genuine issues of material fact as to each of plaintiff's causes of action. We agree.

Rule 56(c) of the Rules of Civil Procedure provides, in pertinent part, that summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." The party moving for summary judgment has the burden of clearly establishing the lack of any triable issue of fact by the record properly before the court; his papers are to be carefully scrutinized and those of the opposing party are on the whole indulgently regarded. *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 251 S.E. 2d 419 (1979). This burden may be met by the movant by either (1) proving that an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim. *City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 268 S.E. 2d 190 (1980); *Moore v. Fieldcrest, supra.* The device of summary judgment effectively forces the non-moving party to produce a forecast of the evidence which he has available for presentation at trial to support his claim or defense. *Moore v. Fieldcrest, supra* at 470, 251 S.E. 2d at 422. Rule 56 authorizes the trial court to deter-

mine only whether a genuine issue of facts exists; it does not authorize the court to decide an issue of fact. *Id.*

The purpose of summary judgment is to eliminate formal trials where only questions of law are involved by permitting penetration of an unfounded claim or defense in advance of trial and allowing summary disposition for either party when a fatal weakness in the claim or defense is disclosed. *Id.* Claims or defenses which are not well suited to summary judgment are those in which the determination of essential elements of these claims or defenses rests within the peculiar expertise of fact finders. "Thus if there is any question as to the credibility of affiants in a summary judgment motion or if there is a question which can be resolved only by the weight of the evidence, summary judgment should be denied." *City of Thomasville v. Lease-Afex, Inc., supra* at 655, 268 S.E. 2d at 193-94; *Moore v. Fieldcrest, supra* at 470, 251 S.E. 2d at 422. Under these standards, the defendant, as the moving party, must initially either (1) prove that an essential element of plaintiff's claims for alienation of affections and criminal conversation is nonexistent or (2) show that a forecast of the evidence indicates that plaintiff will not be able to prove facts giving rise at trial to all essential elements of the claims alleged.

An action for alienation of affections is comprised of wrongful acts which are said to deprive a married person of the affections of his or her spouse, including love, society, companionship and comfort. 2 Lee, N. C. Family Law, § 207, p. 553-54 (1980). In order to sustain a cause of action for alienation of affections, the plaintiff must show the following facts:

(1) that he [plaintiff] and his wife were happily married and that a genuine love and affection existed between them;

(2) that the love and affection so existing was alienated and destroyed;

(3) that the wrongful and malicious acts of the defendant produced and brought about the loss and alienation of such love and affection.

*See Hankins v. Hankins,* 202 N.C. 358, 162 S.E. 766 (1932); *Heist v. Heist,* 46 N.C. App. 521, 265 S.E. 2d 434 (1980); *Warner v. Tor-*

*rence*, 2 N.C. App. 384, 163 S.E. 2d 90 (1968). In this context, the term "malice" does not necessarily mean that which proceeds from a spiteful, malignant, or revengeful disposition, but merely implies conduct injurious to another, though proceeding from an ill-regulated mind not sufficiently cautious before it occasions the injury. If the conduct is unjustifiable, and actually caused the injury complained of, malice in law will be implied. (Citations omitted.) *Cottle v. Johnson*, 179 N.C. 426, 429, 102 S.E. 769, 770 (1920). The wrongful and malicious conduct of the defendant need not be the sole cause of the alienation of affections; it is sufficient if that conduct is the controlling or effective cause of the alienation, even though there were other causes, which might have contributed to the alienation. *Bishop v. Glazener*, 245 N.C. 592, 96 S.E. 2d 870 (1957); *Heist v. Heist, supra.* It is also sufficient if there is no more than a partial loss of the spouse's affections. 2 Lee, *supra* at 554.

The term "criminal conversation" is synonymous with "adultery"; the cause of action is founded on the violation of the right of exclusive sexual intercourse between spouses. *Cottle v. Johnson, supra*; 7 Strong's N. C. Index 3d, Husband and Wife, § 27, p. 84. The elements of the cause of action for criminal conversation are as follows:

(1) the actual marriage between the spouses;

(2) sexual intercourse between defendant and plaintiff's spouse during coverture.

*Sebastian v. Kluttz*, 6 N.C. App. 201, 209, 170 S.E. 2d 104, 108 (1969). Alienation of affection is not a necessary element. *Id.*

A valid separation agreement entered into between the spouses will not necessarily bar an action for alienation of affections or for criminal conversation which occurred prior to the separation. *Sebastian v. Kluttz, supra*; 2 Lee, *supra* at 567; 7 Strong's N. C. Index, *supra* at 84-85. Moreover, the mere fact of separation will not bar an action for criminal conversation occurring during the separation. *Bryant v. Carrier*, 214 N.C. 191, 198 S.E. 619 (1938); 2 Lee, *supra* at 568. The consent of the participating spouse is not recognized as a defense to either the action for alienation of affections, *Chestnut v. Sutton*, 207 N.C. 256,

176 S.E. 743 (1934), or to the action for criminal conversation, *Bryant v. Carrier, supra.*

The defendant submitted three affidavits in support of his motion for summary judgment; two from Rachel Beaman, plaintiff's ex-wife, and one from defendant himself. Ms. Beaman, in her first affidavit, stated that she and the plaintiff had separated or discussed separations several times during the marriage; that since 1976 the marriage was troubled and discordant; that she and the plaintiff had a fundamental difference over matters of religious beliefs and lifestyle; that there had been violent episodes between them; and that the couple had initially separated in May of 1979 and did not live together thereafter. Ms. Beaman also stated that she had begun to date various other men in the late fall of 1979 and early January of 1980. She became acquainted with Jeffrey Miller, the defendant, in December of 1979 and first dated him in February of 1980. Attached to the affidavit as exhibits are copies of two judgments relating to the Cannons' divorce proceedings. The first judgment was entered on 19 March 1981 in the District Court of Greene County. The court found that the parties had initially separated in May of 1979; that Mrs. Cannon established a separate residence for herself, with plaintiff residing on his parents' property; and that the parties had attempted a reconciliation between May and 15 October 1979. Thereafter, the court found that the parties have lived totally separate and apart. Additionally, the judgment recited several instances of marital quarrelling between Rachel and Haywood Cannon that had occurred during the late spring and summer of 1980 as they related to the issue of the fitness of the parents as custodians of their minor child. Based upon its findings, the court granted Rachel Cannon a divorce from bed and board from Haywood Cannon and custody of the parties' minor child. The second exhibit consists of a judgment entered 20 May 1981, granting Rachel Cannon an absolute divorce from the plaintiff; the court finding that the action was instituted in October of 1980, and the jury having found that the parties had been living separate and apart for one year prior to the bringing of the action (October 1979).

In response, plaintiff filed his own affidavit which essentially contradicted all of the assertions of his ex-wife regarding the quality of their marital relationship, the reasons for their separation, and the ultimate failure of the parties to successfully recon-

cile their marital differences. Plaintiff indicated that the marriage had been a normally happy one until the advent of defendant's wrongful interference and that defendant had become acquainted with his ex-wife prior to December of 1979. Further, that defendant continued to see plaintiff's wife after plaintiff requested that he cease seeing her. Plaintiff alleged that he had photographs, home movie films, detective reports and other evidence proving that his marriage had been happy and that the defendant was intimately involved with plaintiff's wife from late September or early October of 1979 onward. Attached as exhibits were several letters written by Mrs. Cannon to various friends or relatives indicating satisfaction with her marriage prior to October 1979.

The defendant then filed his own affidavit indicating that prior to December of 1979, his only contact with Mrs. Cannon was of a professional nature; Rachel Cannon was employed as a Deputy Clerk in the office of the Clerk of Superior Court, Pitt County and defendant would occasionally have contact with her in her official capacity in the course of his duties in representing clients in the Pitt County courts. Defendant stated that he inquired about Rachel Cannon in December of 1979 and was told that she was separated from her husband and dating others; that he did not date her until February of 1980, at which time she told him that she had been separated since May of 1979, and that she no longer loved Mr. Cannon. Defendant did not begin to date Mrs. Cannon regularly until March of 1980; it was his impression that she would soon be filing for divorce and it was never defendant's intention to interfere with or alienate any affection Mrs. Cannon had for Mr. Cannon.

Neither the Miller affidavit, nor the Beaman affidavit contain any response to the plaintiff's allegations that they had engaged in sexual intercourse during the period of time between late September 1979 and May of 1981. Plaintiff's ex-wife provided another affidavit to explain that the circumstances surrounding the taking of a family photograph in the summer of 1980 and submitted by plaintiff belie the apparent harmony of the image.

Plaintiff thereafter filed his answer to defendant's interrogatories on 23 March, in which he listed, *inter alia*, names of two private detectives who would testify and respond to a request to list the specific dates and places of each alleged act of

sexual intercourse occurring between defendant and Rachel Bea-
man prior to 20 May 1981, by listing several that took place be-
tween late September of 1979 and 20 May 1981; the 1979 incidents
having been observed by plaintiff himself. Plaintiff also listed the
names of various witnesses who would testify on his behalf.

[1]   In ruling on defendant's motion for summary judgment, the
trial court apparently assumed that the last relevant date was the
date of the Cannons' separation on 15 October 1979. Clearly, with
respect to the cause of action for criminal conversation, this rul-
ing was erroneous because the mere fact of separation will not
bar an action for criminal conversation occurring during the
separation. *Bryant v. Carrier, supra.* The forecast of defendant's
evidence on this claim is completely devoid of any factual allega-
tions regarding the lack of sexual intercourse between Mrs.
Cannon and defendant during the period of time between the
separation on 15 October 1979 and the Cannons' divorce in May of
1981. Plaintiff's forecast of the evidence indicates that he will be
able to present facts at trial giving rise to all essential elements
of the claim of criminal conversation. No "fatal weakness" has
been disclosed regarding this claim; the question remaining con-
cerns solely the sufficiency of plaintiff's circumstantial evidence
of acts of sexual intercourse and the weight and credibility to be
afforded this evidence. These are questions properly to be re-
solved by the trier of fact and not by the court on motion for sum-
mary judgment. Defendant failed to carry his burden with respect
to this claim and summary judgment was, therefore, erroneously
entered in his favor.

[2]   The question with respect to the evidentiary forecast on the
alienation of affections cause of action is a much closer one. Clear-
ly, the crucial question in this case is the significance of the plain-
tiff's separation from his wife on 15 October 1979 with respect to
the factual issues of (1) whether theirs was a "happy marriage," in
which "genuine love and affection" existed between the marital
partners and (2) whether the loss of this love and affection was
causally related to the conduct of the defendant. It is readily ap-
parent that a determination of the essential elements of this
claim—the existence of "genuine love and affection"—is by
nature ill-suited to resolution on motion for summary judgment. If
such a determination is legally feasible at all, *see* discussion *infra,*

it is surely one which rests within the "peculiar expertise of fact finders." *City of Thomasville v. Lease-Afex, Inc., supra.*

Moreover, the evidentiary forecast on these issues was entirely conflicting. The plaintiff alleged, in both his pleading and affidavit, that defendant and plaintiff's wife became well acquainted in late September or early October of 1979; that they engaged in sexual intercourse from that time until well into the fall of 1980; and that this conduct, together with other actions by the defendant, caused the alienation of the genuine love and affection, theretofore existing between plaintiff and his wife. The defendant's evidentiary forecast clearly controverted these factual allegations, but it did not establish the lack of genuine love and affection between the Cannons as a matter of law.

It must be remembered that the papers of the non-moving party are to be "indulgently regarded." *Moore v. Fieldcrest, supra.* The allegations in plaintiff's affidavit were sufficient to raise a genuine issue on his claim. A final determination on the merits of this claim will obviously turn upon the credibility of the witnesses and the weight of the evidence. It is not for the court to decide these issues of fact at the summary judgment hearing, but only to determine whether they exist. Therefore, summary judgment was also improperly granted on plaintiff's cause of action for alienation of affections.

[3] Defendant also argues that plaintiff's forecast of evidence fails to show circumstances of aggravation in addition to the malice implied by law necessary to support the issue of punitive damages on the alienation of affections claim. Again, we do not agree.

Punitive damages are to be awarded in an alienation case only when there are some features of aggravation in the conduct of the defendant, as when the act is done wilfully and evidences a reckless and wanton disregard of the plaintiff's rights. *Powell v. Strickland,* 163 N.C. 395, 79 S.E. 872 (1913); *Scott v. Kiker,* 59 N.C. App. 458, 297 S.E. 2d 142 (1982); *Sebastian v. Kluttz, supra.*

Plaintiff's forecast of evidence indicates that he will seek to prove adultery as an element in his alienation of affections claim. This is sufficient evidence of "malicious conduct" to support the recovery of compensatory damages. *Scott v. Kiker, supra.* Plain-

tiff's affidavit alleges that defendant interfered with his marriage; became involved with Mrs. Cannon in the latter half of September 1979, with knowledge that she was married to plaintiff and that they had a small child; and that defendant persisted despite plaintiff's confronting defendant and attempting to discourage him from pursuing plaintiff's wife. These allegations are sufficient to raise the issue of whether defendant recklessly disregarded the plaintiff's marital rights. Therefore, summary judgment was erroneously granted as to both causes of action for compensatory and punitive damages.

## II

[4] Defendant's cross-appeal presents the question of whether the causes of action for alienation of affections and criminal conversation should be abolished. Although the two actions have long been judicially recognized in North Carolina, the continued validity of these actions has yet to be examined by our courts.[1] We believe that a review of the historical and theoretical bases of the actions will be helpful in the understanding of our decision that these causes of action should be abolished.

## A

The torts of alienation of affections and criminal conversation both involve intentional interference with the marital relationship. Both actions are said to compensate for injuries described as loss of "consortium" and both purportedly serve to prevent as well as punish intentional interference with the husband-wife relationship and the violation of accepted canons of social conduct. Feinsinger, *Legislative Attack on "Heart Balm,"* 33 Mich. L. Rev. 979, 988-89 (1935). Historically, however, the actions were independent, each purported to protect a distinct interest and each involved different elements of proof and defense. Note, *Alienation of Affections and Criminal Conversation: Unholy Marriage in Need of Annulment*, 23 Ariz. L. Rev. 323 (1981) [hereinafter cited as Note, *Alienation of Affections and Criminal Conversation*].

Alienation of affections developed, in part, out of the husband's right to an action against one who intentionally "enticed"

---

1. In *Scott v. Kiker*, 59 N.C. App. 458, 464, 297 S.E. 2d 142, 147 (1982), the defendant sought to question the validity of the actions, but failed to properly present this issue for appellate review.

his wife to leave the home, or physically abducted her. *See* Fein-singer, *supra* at 992; Prosser and Keeton, The Law of Torts, § 124, pp. 918-19 (5th ed. 1984). The common law action for entic-ing was based upon the deprivation of the husband's right to his wife's services and "consortium." It was judicially adopted in every state except Louisiana.[2] The action for enticement was per-mitted in North Carolina as early as 1849 in the case of *Barbee v. Armstead*, 32 N.C. (10 Ired.) 530 (1849). In that case, recovery of damages to the husband was allowed despite the fact that the evi-dence indicated that he had not provided well for his wife and that she was not taken away against her will. In other words, the plaintiff's fault and the "enticed" spouse's consent to the defend-ant's actions did not constitute defenses to the action.

The action for alienation of affections in North Carolina does not require either the physical separation of the parties or the commission of an act of adultery. *See* Part I of this opinion. The action may be brought against the parents or close relatives of one of the spouses for any intentional interference with the mar-ital relation itself. *See, e.g., Bishop v. Glazener*, 245 N.C. 592, 96 S.E. 2d 870 (1957) (husband against father-in-law); *Ridenhour v. Miller*, 225 N.C. 543, 35 S.E. 2d 611 (1945) (wife against sisters-in-law); *Hankins v. Hankins*, 202 N.C. 358, 162 S.E. 766 (1932) (wife against mother-in-law and father-in-law). The gravamen of this ac-tion is said to be the deprivation of the plaintiff's "conjugal right to the society, affection, and assistance" of his or her spouse. *Cot-tle v. Johnson, supra* at 428, 102 S.E. at 770; *see also Brown v. Brown*, 124 N.C. 19, 32 S.E. 320 (1899).

The origins of the tort of criminal conversation are somewhat more picturesque than those of alienation of affections. The basis of this action is adultery between the defendant and the plaintiff's spouse. The historical provision of a remedy in the form of money damages for adultery as a substitute for the right of the husband among the primitive European tribes to publicly and physically punish the offending parties and/or obtain a new wife is fully discussed in Lippman, *The Breakdown of Consortium*, 30 Colum. L. Rev. 651 (1930) and Comment, *Piracy On The Matrimonial Seas*

---

2. *See Moulin v. Monteleone*, 165 La. 169, 115 So. 447 (1927).

— *The Law and The Marital Interloper*, 25 Sw. L. J. 594 (1971)[3] [hereinafter cited as Comment, *Piracy On The Matrimonial Seas*]. The primary common law interest protected by the action came to be the maintenance of pure bloodlines for inheritance purposes. With the rise of Christianity, moral reasons for discouraging adultery were superimposed, the custom of acquiring a new wife was disregarded, and the remedy of damages, now "unliquidated," emerged in the form of the action for criminal conversation. Lippman, *supra* at 654-55; Comment, *Piracy On The Matrimonial Seas, supra* at 594. By Blackstone's time the action was well established.

> *Adultery*, or criminal conversation with a man's wife, though it is, as a public crime, left by our laws to the coercion of the spiritual courts; yet, considered as a civil injury (and surely there can be no greater), the law gives a satisfaction to the husband for it by action of trespass *vi et armis* against the adulterer, wherein the damages recovered are usually very large and exemplary. 2 W. Blackstone, Commentaries, 139.

Comment, *Piracy On The Matrimonial Seas, supra* at 594-95.

The only substantive defense recognized is that of consent of the plaintiff husband to the conduct complained of, whether as to alienation or criminal conversation. Prosser and Keeton, *supra* at 921. Neither the separation of the spouses at the time the adultery occurred; nor the willingness of the wife to engage in the offending conduct as evidenced by her consent or even her initiation of the activity; nor the fact that the plaintiff himself was unfaithful to his wife constitute defenses to the action. *See Bryant v. Carrier, supra; Cottle v. Johnson, supra; Scott v. Kiker, supra.* Thus, it has been observed that criminal conversation has all the characteristics of a strict liability tort. Recovery is assured upon

---

3. Early punishments were physical and public. Among the Teutonic tribes, for example, adultery was punished severely. The husband was permitted "to cut off the hair of the guilty wife, and having assembled her relations, expel[l] her naked from his house, pursuing her with stripes through the village." Tacitus, *Germania*, Pt. 1, ch. 19, lines 1-4, *quoted in* Comment, *Piracy On The Matrimonial Seas—The Law And The Marital Interloper*, 25 Sw. L. J. 594, 594 (1971). Additionally, some tribes permitted the husband to kill the lover if he found him in the act. Lippman, *The Breakdown of Consortium*, 30 Colum. L. Rev. 651, 654-55 (1930). Later, penalties were lessened; the husband was merely permitted to emasculate the adulterer, collect a monetary penalty and receive a new wife. *Id.* at 655.

proof of the marriage between the plaintiff and his spouse and an act of adultery occurring between the defendant and plaintiff's spouse during the marriage. *See, e.g.* Note, *Hunt v. Hunt: The Status of the "Heartbalm" Torts in South Dakota*, 27 S.D. L. Rev. 160, 162 (1981) [hereinafter cited Note, *Hunt v. Hunt*]; Note, *Alienation of Affections and Criminal Conversation, supra* at 324-25.

At common law, only the husband was able to recover. "The gravamen of the cause of action for criminal conversation is the defilement of plaintiff's wife by the defendant." *Chestnut v. Sutton, supra* at 257, 176 S.E. at 743. "[T]he husband has certain personal and exclusive rights with regard to the person of his wife, which are interfered with and invaded by criminal conversation with her; that such an act on the part of another man constitutes an assault even when, as is almost universally the case as proved, the wife in fact consents to the act. . . ." *Cottle v. Johnson, supra* at 428-29, 102 S.E. at 770. The action by the husband "is based upon the idea that the act of the defendant is a violation of the marital rights of the husband in the person of his wife, to the exclusion of all others, and so the act of the defendant is an injury to the person and also to the property rights of the husband." *Tinker v. Colwell*, 193 U.S. 473, 485, 24 S.Ct. 505, 508, 48 L.Ed. 754, 759 (1904). The action was said to prevent "the defilement of the marriage bed, the blow to the family honor and the suspicion cast upon the legitimacy of the offspring." *Id.* at 484, 24 S.Ct. at 507, 48 L.Ed. at 759.

## B

While the two actions are historically distinguishable, in their modern setting they are substantially alike in both their public and private functions; both actions purport to compensate for private injury judicially described as loss of "consortium" to deter marital interference and to promote marital harmony.

The common law foundation of the husband's right of action for loss of consortium is based upon the view that the wife was her husband's servant, both were considered his chattels, and an interference with the service of a servant is an actionable trespass. Lippman, *supra* at 651. The husband's exclusive right to maintain an action for either negligent or intentional interference with his right of consortium was explained by Chief Justice Clark

in *Hipp v. Dupont*, 182 N.C. 9, 12-13, 108 S.E. 318, 319 (1921) as follows:

> At common law the husband could maintain an action for the injuries sustained by his wife for the same reason that he could maintain an action for injuries to his horse, his slave or any other property; that is to say by reason of the fact that the wife was his chattel. This was usually presented in the euphemism that "by reason of the unity of marriage" such actions could be maintained by the husband. But singularly enough this was not correlative and the wife could not maintain an action for injuries sustained by her husband.
>
> The reason is thus frankly stated by Blackstone: "We may observe that in these relative injuries, notice is only taken of the wrong done to the *superior* of the parties (husband) injured by the breach and dissolution of either the relation itself, or at least the advantage accruing therefrom; while the loss of the *inferior* (the wife) by such injuries is totally unregarded. One reason for this may be this: that the *inferior* hath no kind of property in the company, care or assistance of the *superior* as the *superior* is held to have in those of the *inferior*; and therefore the *inferior* can suffer no loss or injury." 3 Blackstone's Commentaries, 143.

Thus, the nature of the husband-wife relationship, the duties imposed upon the wife, together with the fact that she was legally the inferior party in the relationship, gave the husband the same exclusive proprietary interest in his wife as he had in his servants. This property right in the husband was deemed sufficient in law to support an action for money damages when the services owed by the wife were interfered with.

Consortium was originally said to be made up of a bundle of the husband's legal rights to the services, society and sexual intercourse of his wife. Prosser and Keeton, *supra* at 916. Later, when the proprietary and service-related basis of the action for loss of consortium came into conflict with changes in the legal status of women, the concept of consortium was broadened to include a fourth element of "conjugal affection," with a somewhat lessened emphasis on the notion of the property right to "services." *See* Lippman, *supra* at 652-53. Prosser and Keeton, *supra* at 916.

[T]he wrong relates to the injury which the husband sustains by the dishonor of his marriage bed; the alienation of his wife's affections; the destruction of his domestic comfort; the suspicion cast upon the legitimacy of her offspring; the loss of consortium, or the right to conjugal fellowship of his wife, to her company, cooperation and aid in every conjugal relation; the invasion and deprivation of his exclusive marital rights and privileges; his mental suffering, injured feelings, humiliation, shame and mortification, caused by the loss of her affections and the disgrace which the tortious acts of defendant have brought or heaped upon him, and which are proximately caused by said wrong. (Citations omitted.) And for these results the plaintiff is entitled to recover compensatory damages. . . . (Citations omitted.)

*Powell v. Strickland, supra* at 323-24, 79 S.E. at 876. In other words, the husband was considered to possess a proprietary interest in the body and the mind or affections of his wife. As one court aptly observed: "[t]here are two primary rights in this case; one is the right of the plaintiff to the body of his wife, and the other to her mind, unpolluted." *Sullivan v. Valiquette*, 66 Colo. 170, 172, 180 P. 91, 91 (1919).

Most states, including North Carolina, acted to equalize the legal status of wives with the passage of Married Women's Property Acts in the late nineteenth and early twentieth centuries. Comment, *Alienation of Affections: Flourishing Anachronism*, 13 Wake Forest L. Rev. 585, 588 (1977). These Acts granted wives equal rights to own property and to sue in their own names to recover damages for their own personal injuries. *Id.* After the passage of this legislation, a husband in North Carolina retained the right to maintain an action for the loss of his wife's consortium. *See, e.g. Hipp v. Dupont, supra; Powell v. Strickland, supra; Johnson v. Allen*, 100 N.C. 131, 5 S.E. 666 (1888). This was so despite the fact, as several commentators noted, that given the derivation of these actions from the legal inferiority of women, following passage of the Acts, the courts might reasonably have either "deprived the husband of his existing action or allowed the wife a similar action." *See* Feinsinger, *supra* at 990; Lippman, *supra* at 662; Note, *Alienation of Affections and Criminal Conversation, supra* at 329.

The majority of courts, including our Supreme Court, chose to extend the existing rights of action to the wife on the theory of her equal interest in the marriage relation, but did so without altering the underlying structure of the actions. *See, e.g. Knighten v. McClain*, 227 N.C. 682, 44 S.E. 2d 79 (1947); *Hinnant v. Power Co.*, 189 N.C. 120, 126 S.E. 307 (1925), *overruled on other grounds, Nicholson v. Hospital*, 300 N.C. 295, 266 S.E. 2d 818 (1980); *Hipp v. Dupont, supra; Brown v. Brown*, 124 N.C. 19, 32 S.E. 320 (1899). However, as early as 1927, the Supreme Court of Louisiana in *Moulin v. Monteleone*, 165 La. 169, 115 So. 447 (1927) refused to recognize the action for alienation of affections on the ground, *inter alia*, that the right of action remained permeated with the uncultivated and obsolete ideas which marked its origin in a more primitive society where the wife was one of the husband's chattels and her companionship, services and affections were his property. The court observed that it was the husband's legal superiority which originally justified the husband's right of action, and concluded that under current law, neither spouse could be said to stand as superior to the other and therefore neither could maintain such an action.

> It is just as true that a man can have no kind of property in the company, care or assistance of one who is, in every sense, his equal in the eyes of the law. It is not the wife's inferiority, but her want of superiority, that denies her the right of action, accorded the husband at common law, to recover damages for the alienation of the affections of the other spouse.

*Id.* at 176-77, 115 So. at 450.

The historical property-based foundation of the torts—loss of services and impure bloodlines for inheritance purposes—gave way to more abstract theories of the injuries to be compensated and the interests to be protected once the actions were extended to wives. The modern actions are generally sanctioned as attempts to maintain family solidarity and preserve marital harmony by deterring wrongful interference. *See, e.g.*, Feinsinger, *supra* at 1008; Comment, *Piracy On The Matrimonial Seas, supra* at 613; Note, *The Suit of Alienation of Affections: Can Its Existence Be Justified Today?* 56 N.D. L. Rev. 239 (1980) [hereinafter cited, Note, *The Suit of Alienation of Affections*]; Comment,

*Alienation of Affections: Flourishing Anachronism,* 13 Wake Forest L. Rev. at 585; Note, *Alienation of Affections and Criminal Conversation, supra* at 324. Loss of "conjugal affection" and violation of inherent marital rights were substituted for the service-based injuries originally discussed. *See generally,* Lippman, *supra* at 664; Feinsinger, *supra* at 991.

However, no structural adjustments were made in the elements of proof and defense in conformity with the equalized legal status of the parties to a marriage. In essence, the legal fiction of the husband's property right in the body and mind of his wife was not destroyed, but was given a new life. This is demonstrated by the fact that the consent or willingness of the participating spouse to either engage in extramarital sexual intercourse or to voluntarily transfer his or her affections to the defendant has not been recognized as constituting a defense to either action. The traditional disallowance of the defense of consent was rooted in the inferior legal status of the wife; as a legal inferior, she could not consent to the injury of her superior, her husband. *See Hipp v. Dupont, supra.* The failure to recognize consent as a defense discloses the fundamentally untouched property basis of liability; each spouse merely becomes the "chattel" of the other in the context of the modern actions. Thus, the untransformed torts were structurally ill-suited to actually promote marital harmony and protect the inherent marital rights of conjugal affection and fidelity. Common sense dictates that by definition, these are "rights" which can only be voluntarily given to one spouse by the other. Barring changes in the structural elements of liability and defense in conformity with the equalization of the spouses' legal status and the changing role of marriage in modern society, the actions quickly became removed from the realm of social reality.

For example, the marital couple's own failure to create or promote the marital harmony purportedly destroyed by the "predatory" third party will not bar a valid cause of action. In *Heist v. Heist, supra,* the defendant's conduct was found to be the controlling and effective cause of the separation of the plaintiff and her husband despite evidence tending to show that the plaintiff "may have been rather argumentative, overbearing and domineering of conversation while her husband was a quiet, patient mild mannered man, for thirty years," and "that plaintiff's husband expressed his preference for the defendant because her

voice was 'soft.' " 46 N.C. App. at 524-25, 265 S.E. 2d at 437. In *Scott v. Kiker, supra,* the plaintiff's own infidelity to his wife was not held to bar his recovery for either alienation of affections or criminal conversation.

Similarly, in *Sebastian v. Kluttz, supra,* the plaintiff wife was able to establish the elements of a previously "happy marriage," the existence of at least *"some* love and affection," and a causal connection between the defendant's conduct and the loss of that affection despite evidence indicating that plaintiff's husband had previously been unfaithful, the plaintiff and her husband had separated a number of times during their marriage, and the "tranquility" of the home had been impaired by drinking and other conduct of plaintiff's husband. Furthermore, the evidence indicated that the plaintiff's husband had undertaken to visit the defendant at her own home. This Court held that "[t]he consent, and apparent willingness, on the part of the plaintiff's husband to be seduced cannot be claimed as a defense by defendant." 6 N.C. App. at 208-209, 170 S.E. 2d at 107-108. As one writer has observed, "The idea that one spouse can recover for an act the other spouse has willingly consented to is perhaps better suited to an era that regarded one spouse as the property of another. . . ." Prosser and Keeton, *supra* at 917.

## C

Over the last fifty years the two tort actions have come under considerable attack from the public, commentators, and the courts and nearly half the state legislatures have abolished them. It has been widely recognized that the modern actions are based upon "psychological assumptions that are contrary to fact." H. Clark, Law of Domestic Relations, § 10.2, p. 267 (1968); *see also* Note, *The Suit of Alienation of Affections, supra* at 239-40; Comment, *Piracy On The Matrimonial Seas, supra* at 613. The problem has been summarized as follows:

> [T]he action for alienation of affections, and to a considerable extent the action for criminal conversation proceed on the hypothesis of a perfectly harmonious husband-wife relationship destroyed or impaired by a malicious, scheming and seductive intruder. Even if this hypothesis were correct, the effectiveness of the damage remedy as a preventative may seriously be doubted, as the courts themselves have conceded

in denying the remedy of injunction. But the hypothesis is far from conforming to the life pattern, as indicated by the facts of the cases and even by judicial opinions. As a rule, defendant becomes enmeshed with plaintiff's spouse without preconceived design. Where there is such design, juries can scarcely be expected to proceed on any objective basis to distinguish the pursuer from the pursued. Frequently the marital relationship has previously been openly disrupted, and it is safe to assume that in most cases internal disintegration has already commenced when defendant appears on the scene. An expert social scientist would scarcely undertake to designate any one cause of disorganization as "controlling" in a given case, yet the law confidently relies on the jury to make such a selection. Furthermore, the law finds no incongruity in awarding pecuniary compensation for the invasion of a relationship to which plaintiff by his previous or subsequent conduct has shown himself indifferent. Pecuniary loss is insignificant in comparison with injury to feelings in the element of compensation, and the award of indemnity is small in comparison with the assessment of exemplary damages. With these rules and consequences in view, an innocent defendant is easily induced to agree to a settlement through the threat of an action by a designing spouse or by both spouses acting in concert. On the whole, the action seems ill suited to remedy a private or public wrong, and strongly conducive to extortion, blackmail and public scandal.

Feinsinger, *supra* at 995-96.

It is generally agreed that the application of tort theory to the loss of conjugal affection cannot accurately reflect the mechanics of the usual marriage breakup because the tort concept of causation is far too simplistic.

Since any definitive assessment of cause in such cases would require a full exploration of the marital history and the parties' deepest motives, the courts must be content with a rough and ready judgment as to whether the defendant was sufficiently instrumental in bringing about the marital breakup to justify holding him responsible. Even this common sense approach is not realistic, since a marriage is not broken up by outsiders if it is solidly based on the affections of the

parties. Causes in such a case are both numerous and obscure. Yet the courts can hardly look more deeply into it than this.

Clark, *supra* at 266. *See also*, Comment, *Piracy On The Matrimonial Seas, supra* at 613 (various psychologists have conceded the difficulty of determining cause of divorce; third party in the romantic triangle is not considered causally important in cases of extramarital sexual activity). Moreover, the underlying presumption of the perfectly harmonious spousal relationship destroyed by the "predatory intruder" itself proceeds from the obsolete and unrealistic premise that the enticed spouse has no free will or individual mind with which to resist such advances, but has allowed herself or himself to be led astray to the detriment of the existing marriage.

The first wave of opposition to the actions gathered force in the 1930's. At that time, a number of state legislatures responded by passing statutes to abolish or severely limit the action for alienation of affections or the action for criminal conversation or both. Some of the statutes abolish the actions for seduction and breach of promise to marry as well. Prosser and Keeton, *supra* at 930; Note, *Alienation of Affections and Criminal Conversation, supra* at 330.

The surface explanation of this [initial and] unusual legislative receptivity is a reaction against the prevalence of blackmail peculiar to these actions, the incongruity of applying the damage remedy to injured feelings, and the perversion of that remedy by courts and juries to express their emotional sympathy and moral indignation. The underlying explanation is probably a realization of the failure of these actions to accomplish their original social purposes, and their non-conformity with changed *mores* concerning sex morality, the status of women, and the functions of the family. While the importance of the affectional relations of husband and wife may still justify their legal protection, the social cost of such protection by means of an action for damages may exceed its worth.

*        *        *

The justification for singling out the two actions in question from various intentional injuries to feelings, and from other intentional injuries to consortium lies in their peculiar susceptibility to the abuses in question. The characteristic which distinguishes these actions is their connotation of sexual misbehavior, by reason of which emotion and moral indignation prevail over considerations of private or public injury in the assessment of damages. For the same reason the actions attract disproportionate publicity. One result of this combination of factors is to encourage unfounded claims, and another is to induce innocent defendants to enter into extra-judicial settlements. Three legislatures have presumably weighed these results against the sacrifice of meritorious claims and have abolished the actions by large majorities.

The new legislation may also be regarded as a recognition of changed social concepts of family solidarity and functions. The recent tendency has been to relax traditional legal controls by permitting suits among members of the family and by allowing easier means of divorce. The recent statutes further relax such controls by recognizing and protecting increased freedom of association between each spouse and the outside world. From this broad point of view the current legislative movement is thoroughly commendable.

Feinsinger, *supra* at 979, 1009.

Since the 1930's, there has been a steady trend to abolish the actions. Twenty-seven states and the District of Columbia have abolished the action for alienation of affections by statute;[4] three

4. Ala. Code § 6-5-331 (1975) (abolished for monetary damages); Ariz. Rev. Stat. Ann. § 25-341 (Supp. 1984-1985); Cal. Civ. Code § 43.5 (West 1982); Colo. Rev. Stat. § 13-20-202 (1973); Conn. Gen. Stat. Ann. § 52-572b (West Supp. 1984); Del. Code Ann. tit. 10, § 3924 (1974); D. C. Code Ann. § 16-923 (1981); Fla. Stat. Ann. § 771.01 (West 1964) (abolished for monetary damages); Ga. Code Ann. § 51-1-17 (1982); Ind. Code Ann. § 34-4-4-1 (Burns 1973 & Supp. 1982); Me. Rev. Stat. Ann. tit. 19 § 167 (1964); Md. Cts. & Jud. Proc. Code Ann. § 5-301(a) (1984); Mich. Comp. Laws Ann. § 600.2901 (West 1968); Minn. Stat. Ann. § 553.02 (West Supp. 1984); Mont. Code Ann. § 27-1-601 (1983); Nev. Rev. Stat. § 41.380 (1979); N. H. Rev. Stat. Ann. § 460.2 (1983) (abolished for monetary damages); N. J. Stat. Ann. § 2A:23-1 (West 1952) (abolished for monetary damages); N. Y. Civ. Rights Law § 80-A (McKinney 1976); Ohio Rev. Code Ann. § 2305.29 (Page 1981); Okla. Stat. Ann. tit. 76, § 8.1 (West Supp. 1983-1984) (with insignificant exceptions); Or. Rev. Stat. § 30.840

states have imposed a one year statute of limitation to curtail the action;[5] and one state has statutorily abolished punitive damages for alienation of affection.[6] Twenty-one states and the District of Columbia have abolished criminal conversation by statute.[7] Five states have shortened statutes of limitations to curtail the cause of action;[8] and five states have statutorily limited the amount of damages or costs recoverable for criminal conversation.[9] Interestingly, in one state the statute of limitations for criminal conversation, and other personal injuries, has been shortened to one year, although the statute of limitations for alienation of affection, and *other property injuries*, is three

---

(1983); Pa. Stat. Ann. tit. 48, § 170 (Purdon 1965) (with insignificant exceptions); Vt. Stat. Ann. tit. 15, § 1001 (Supp. 1984) (abolished for monetary damages); Va. Code § 8.01-220 (1984); W. Va. Code § 56-3-2A (Supp. 1984); Wis. Stat. Ann. § 768.01 (West 1981); Wyo. Stat. § 1-23-101 (1977) (abolished for monetary damages).

5. Ark. Stat. Ann. § 37-201 (Supp. 1983); Ky. Rev. Stat. § 413-140(1)(c) (1984); R. I. Gen. Laws. § 9-1-14 (Supp. 1984).

6. Ill. Ann. Stat. ch. 40 §§ 1901-1907 (Smith-Hurd 1980) (limited to actual damages).

7. Ala. Code § 6-5-331 (1975) (abolished for monetary damages); Cal. Civ. Code § 43.5 (West 1982); Colo. Rev. Stat. § 13-20-202 (1973); Conn. Gen. Stat. Ann. § 52-572f (West Supp. 1984); Del. Code Ann. tit. 10, § 3924 (1974); D. C. Code Ann. § 16-923 (1981); Fla. Stat. Ann. § 771.01 (West 1964) (abolished for monetary damages); Ga. Code Ann. § 51-1-17 (1982); Ind. Code Ann. § 34-4-4-1 (Burns 1973 & Supp. 1984); Mich. Comp. Laws Ann. § 600.2901 (West 1968); Minn. Stat. Ann. § 553.02 (West Supp. 1984); Nev. Rev. Stat. § 41.380 (1979); N. J. Stat. Ann. § 2A:23-1 (West 1952) (abolished for monetary damages); N. Y. Civ. Rights Law § 80-A (McKinney 1976); Ohio Rev. Code Ann. § 2305.29 (Page 1981); Okla. Stat. Ann. tit. 76, § 8.1 (West Supp. 1983-1984) (with insignificant exceptions); Or. Rev. Stat. § 30.850 (1983); Tex. Fam. Code Ann. § 4.05 (Supp. 1984); Vt. Stat. Ann. tit. 15, § 1001 (Supp. 1984) (abolished for monetary damages); Va. Code § 8.01-220 (1984); Wis. Stat. Ann. § 768.01 (West 1981); Wyo. Stat. § 1-23-101 (1977) (abolished for monetary damages).

8. Ark. Stat. Ann. § 37-201 (Supp. 1983) (one year); Ill. Ann. Stat. ch. 83, § 15 (Smith-Hurd 1966) (two years); Ky. Rev. Stat. § 413.140(1)(c) (1984) (one year); Mo. Ann. Stat. § 516.140 (Vernon 1952 & Supp. 1984) (two years); Tenn. Code Ann. § 28-3-104 (1980) (one year).

9. Ill. Ann. Stat. ch. 40 ¶¶ 1951-57 (Smith-Hurd 1980) (limited to actual damages); Ky. Rev. Stat. § 413.140(1)(c) (1984) (limited damages); Miss. Code Ann. § 11-7-113 (1972 & Supp. 1983) (offers of satisfaction by defendant disallowed); S. C. Code Ann. § 15-37-50 (Law. Co-Op 1976) (limitation on recoverable costs); Wash. Rev. Code Ann. § 4.84.040 (1962) (limitation on recoverable costs).

years.[10] Consistent with major criticism of the two actions—that they encourage blackmail—in at least eight states it is a crime to file a complaint based on either action.[11] There are no such statutes in North Carolina. *See* 1 Lee, *supra*, § 3, p. 20.

The "heart balm" torts have been severely criticized by commentators and their abolition has been almost universally advocated. *See generally*, Lippman, *supra*; Feinsinger, *supra*; Clark, *supra* at 267; Note, *Alienation of Affections and Criminal Conversation, supra*; Comment, *supra*; 13 Wake Forest L. Rev. 585; Comment, *Piracy On The Matrimonial Seas, supra*; Note, *Hunt v. Hunt, supra*; Note, *The Suit of Alienation of Affections, supra; But see* Note, *The Case for Retention of Causes of Action for Intentional Interference with the Marital Relationship*, 48 Notre Dame Law. 426 (1972) (author advocates preservation of action for alienation of affections, inclusion of adultery as an element of that cause of action, and abolition of the separate criminal conversation action). The reasons for abolition most commonly stated have been summarized as follows:

> The reasons underlying abolition of alienation of affections are many and persuasive. One is the opportunities for blackmail which the action provides, since the mere bringing of the action can ruin the defendant's reputation. Another is the lack of any reasonably definite standards for assessing damages and the possibility of punitive damages makes excessive verdicts likely. Still another is the peculiar light which the whole proceeding throws on the nature of marriage, leaving one with the conviction that the successful plaintiff has engaged in something which looks very much like a forced sale of his spouse's affections. Most significantly of all, the action for alienation is based upon psychological assumptions that are contrary to fact. As has been indicated,

10. Tenn. Code Ann. §§ 28-3-104 (1980) (criminal conversation; one year statute of limitation); Tenn. Code Ann. §§ 28-3-105 (1980) (alienation of affection; three year statute of limitations).

11. Fla. Stat. Ann. § 771.01 (West 1964); Ind. Code Ann. § 34-4-4-1 (Burns 1973 & Supp. 1984); Md. Cts. & Jud. Proc. Code Ann. § 5-301 (1980); Mont. Code Ann. § 27-1-601 (1983); N. J. Stat. Ann. § 2A:23-1 (West 1952); N. Y. Civ. Rights Law § 80-A (McKinney 1976); Wis. Stat. Ann. § 768.01 (West Supp. 1981); Wyo. Stat. § 1-23-101 (1977).

viable, contented marriages are not broken up by the vile seducer of the Nineteenth Century melodrama, though this is what the suit for alienation assumes. In fact the break-up is the product of many influences. It is therefore misleading and futile to suppose that the threat of a damage suit can protect the marital relationship. For all these reasons the abolishing statutes reflect a sound public policy and ought to be enacted more widely than they are.

Clark, *supra* at 267.

## D

In those states where the actions were not legislatively eliminated, defendants during the last decade began to argue that the actions were no longer justified and should be judicially abolished. The action for criminal conversation has now been abolished by judicial decision in several states. *Fadgen v. Lenkner*, 469 Pa. 272, 365 A. 2d 147 (1976); *Kline v. Ansell*, 287 Md. 585, 414 A. 2d 929 (1980) (cause of action under which only a man can sue or be sued is unconstitutional as violative of state equal rights amendment); *Hunt v. Hunt*, 309 N.W. 2d 818 (S.D. 1981) (action for criminal conversation unanimously abolished; two of the five justices would also abolish action for alienation of affections; three justices would preserve action for alienation, but concur in majority's result for lack of evidence to sustain the alienation action); *Bearbower v. Merry*, 266 N.W. 2d 128 (Iowa 1978) (action for criminal conversation abolished; action for alienation of affections *initially retained*).

The primary justification behind the judicial abolition of the tort of criminal conversation is the lack of logically valid defenses on the merits; of secondary importance to three of the four courts mentioned was the fact that the legislatures of Iowa, Pennsylvania, and South Dakota had recently decriminalized the very behavior upon which the civil action rests. *See Hunt v. Hunt, supra* at 822. In *Fadgen v. Lenkner, supra*, the Supreme Court of Pennsylvania reasoned that apart from the fact that the action for criminal conversation was by nature seriously prone to abuse, the cause of action itself was anachronistic because the antiquated common law reasoning of the wife's inferiority which lay "behind stripping a defendant of all defenses to an action in criminal con-

versation, save the plaintiff's consent, no longer merits endorsement." *Fadgen v. Lenkner, supra* at 279, 365 A. 2d at 150.

> . . . in today's society it is unreasonable to impose upon a
> defendant such harsh results without affording any real op-
> portunity to interject logically valid defenses on the merits
> such as the role of the plaintiff's spouse in the adulterous
> relationship or the quality of the plaintiff's marriage prior to
> the occurrence of the acts constituting the tort.

*Id.* at 280-81, 365 A. 2d at 151. The court stated that although it
"in no way condone[d] sexual promiscuity and continue[d] to hold
the institution of marriage in the highest regard," *Id.* at 279, 365
A. 2d at 150, nevertheless it was the court's duty to act to abolish
a court-made rule where the rationale justifying the old rule no
longer finds support in reason and a right sense of justice to
recommend it. *Id.* at 281, 365 A. 2d at 151.

In *Hunt v. Hunt, supra,* the South Dakota Supreme Court
characterized both alienation of affections and criminal conversa-
tion as "outmoded archaic holdovers" from an era when wives
were considered the chattel of their spouse rather than distinct
legal entities.

> Wives are not property. Neither are husbands. The love and
> affection of a human being who is devoted to another human
> being is not susceptible to theft. There are simply too many
> intangibles which defy the concept that love is property.

*Hunt v. Hunt, supra* at 821. The court reasoned that in particular,
the tort of criminal conversation was no longer in harmony with
public policy and should be judicially abolished because defenses
which should logically prevent criminal conversation actions have
no legal effect. In concluding, the court added that, "We . . .
believe that there is a logical limitation on the intrusion by the
judicial branch upon the private lives and morals of its citizens."
*Id.* at 822. The majority's rationale would, of course, also support
abolition of the torts of alienation of affections. *See*, Note, *The
Suit of Alienation of Affections, supra* at 165.

In *Bearbower v. Merry, supra,* the Supreme Court of Iowa
also abolished the tort of criminal conversation, while retaining
the action for alienation of affections. Of particular concern to the

*Bearbower* court was the modern tort's lack of a real and rational relation to the goals of promoting marital harmony and preventing marital failure.

> A fundamental flaw in the criminal conversation remedy, as opposed to the alienation of affections remedy, is its insensitive imposition [of liability] without regard to the viability of the marriage relationship, or to the fact, in a given instance, that [the] relationship may not have been affected adversely. In short, recovery may be allowed where stability of the marriage survives unimpaired.

*Bearbower v. Merry, supra* at 135.

The dissent in *Bearbower* reasoned that both torts should be abolished; "These 'heart-balm' torts are [both] based on a false view of marriage and human nature. They denigrate marriage and debase the common law." *Id.* at 136 (McCormick, J., dissenting in part). The primary reasons cited in the dissenting opinion for abolishing the alienation action are: (1) that one spouse does not have a proprietary interest in the love of the other; (2) spousal love is not property which is subject to theft or alienation; and (3) an action for alienation of affections is not a rational means of preserving a marriage. *Id.* at 137.

Citing various authorities on the subject of marriage and the prevention or cure of marital failure,[12] the dissent stated that it failed to find any indication that the existence of the alienation action is an effective deterrent to marital breakdown or a device for protecting the family unit.

> A common denominator runs through these studies. It is that a marriage is a union of individuals. They marry for motives which are frequently nonrational. . . . Despite the marriage the parties retain their individuality. During its course a constant process of interaction occurs. Success of the marriage

---

12. These authorities are: R. Anshen, *The Family: Its Function and Destiny* (Rev. Ed. 1959); J. Sirjamaki, *The American Family in the Twentieth Century* (1953); R. Cavan, *The American Family* (Fourth Ed. 1969); P. Landis, *Making the Most of Marriage* (Fourth Ed. 1970); P. Popenoe, *Marriage is What You Make It* (1969); C. Broderick, *A Decade of Family Research and Action* (National Council on Family Relations, 1971); W. Lederer and D. Jackson, *The Mirages of Marriage* (1968). 266 N.W. 2d at 137-138.

depends on the ability and willingness of each spouse to make the constant adjustments necessary because of the individuality of the other. . . .

The disintegration of a marriage is ordinarily as complex a process as is its integration. It seldom occurs overnight. It starts from within. It is not caused by only one factor or through some imperfection of only one of the spouses. Any third person who kicks at the cornerstone of a shaky marriage will not bring it down without active support from one or both of the parties. It is simplistic and unrealistic to suppose the edifice will be held together either so long as or because spouses have the right to obtain vengeance in the form of damage suits against the third person. Although a recovery of damages will punish the third person and sooth the ego while enriching the purse of the plaintiff, it is hardly calculated to be a constructive influence in maintaining or restoring a mature and stable marriage between two individuals with free will and separate identity.

*Id.* at 138. The dissent observed further that both the fault divorce system and the tort of alienation of affections and criminal conversation provided a "mechanism for playing out [the] fantasy" that responsibility for a marriage's failure lay with "someone else." Moreover, the torts brought out the worst in human nature, were destructive of the goal they purported to foster and denigrated human dignity by reducing marital values to monetary terms.

They provide a forum for vindictiveness and posturing self-justification. . . .

. . .

Heartbalm actions arise from the same motives and serve no nobler purpose than the stoning of the adulteress condemned in the New Testament or the affixing of the scarlet letter decried by Hawthorne, and they have no more to do with protecting marriage and the family than either of those events.

*Id.* at 138.

Three years later the same court acted to abolish the tort of alienation of affections in *Fundermann v. Mickelson*, 304 N.W. 2d 790 (Iowa 1981). The *Fundermann* court rejected the argument

that abrogation of a common law right should come from the legislature rather than from the courts, that the doctrine of *stare decisis* would be impugned by abolition so soon after its decision in *Bearbower*. The court reasoned that apart from problems of proof and excessive jury verdicts, the *theory* of recovery in an alienation action was *itself flawed*. The court stated:

> The right to recover for loss of consortium is a factor in assessing damages when underlying liability has been established in a personal injury suit. Renunciation of the right to recover for alienation proceeds from the belief there is no basis for the underlying liability.

> In the last analysis we think the action should be abolished because spousal love is not property which is subject to theft . . . the plaintiffs in such suits do not deserve to recover for the loss of or injury to "property" which they do not, and cannot own.

*Id.* at 794.

The other state in which the action for alienation of affections has been eliminated is Washington. Initially, the action was abolished by the Washington Court of Appeals in *Wyman v. Wallace*, 15 Wash. App. 395, 549 P. 2d 71 (1976), *reversed*, 91 Wash. 2d 317, 588 P. 2d 1133 (1979), *vacated and affirmed*, 94 Wash. 2d 99, 615 P. 2d 452 (1980). The Court of Appeals, basing its decision upon a combination of judicially noticed facts concerning the marital relationship and scholarly works on the subject of alienation of affections, concluded that because there was so little possible social utility in the action, when balanced against the social and individual harm that it can cause, its existence could not be justified in contemporary society. *Id.* at 399-400, 549 P. 2d 73-74. The Washington Supreme Court in *Wyman v. Wallace*, 94 Wash. 2d 99, 615 P. 2d 452 (1980), ultimately affirmed the Court of Appeals decision and abolished the action. The Court agreed that the five major reasons given by the lower appellate court were valid and called for the abolition of the alienation action. These reasons are as follows:

> (1) The underlying assumption of preserving marital harmony is erroneous; (2) The judicial process is not sufficiently capable of policing the often vicious out-of-court settlements; (3)

The opportunity for blackmail is great since the mere bringing of an action could ruin a defendant's reputation; (4) There are no helpful standards for assessing damages; and (5) The successful plaintiff succeeds in compelling what appears to be a forced sale of the spouse's affections.

*Id.* at 105, 615 P. 2d at 455.

The question of whether to retain or eliminate the tort of alienation of affections was most recently addressed by the Supreme Court of Utah in *Nelson v. Jacobsen*, 669 P. 2d 1207 (Utah 1983). A majority of the justices in *Nelson* declined to eliminate the action altogether, choosing instead to make the requirements for recovery more stringent. The majority conceded that the suit for alienation of affections does not serve to preserve or protect a marriage from interference, *Id.* at 1216, and conceded the difficulty of proving causation in such actions, *Id.* at 1218, but found none of the policy arguments advanced by the defendant,[13] considered either separately or together, to warrant complete abolition of the tort.

The well-documented dissenting opinion forcefully argued that the action for alienation of affections should be abolished because there is no longer any legal basis for its retention. *Id.* at 1222, 1223 (Durham, J., concurring in the result and dissenting).

[T]his is an action without legal content, signifying nothing but the desire to wring money and revenge from the pain of a failed relationship. The old common law cause of action had real content in the days when the husband had a legally recognized right to his wife's services. Although we now find the concept repugnant, in the past those legal rights accurately reflected the order and consensus of society regarding the status of married persons. In that society, it was logical that a court could find a third party responsible for damage to the husband's marital rights because the wife had no legally recognized existence apart from her husband, and

---

13. The six policy arguments advanced by the defendant are essentially the same reasons given by the Washington Supreme Court in *Wyman v. Wallace, supra,* as warranting abolition. In addition, the defendant in *Nelson* argued that the tort remedy infringes upon the right to privacy. *Nelson v. Jacobsen*, 669 P. 2d 1207, 1217 (Utah 1983).

was generally considered more passive and persuadable by nature. Those days and those rights have passed and this cause of action should be gone with them.

*Id.* at 1227-28. The dissent pointed out that in modern society, as contrasted with feudal society, it is widely accepted that the purpose of marriage is not pecuniary. Rather, it serves as a means by which men and women seek personal fulfillment and happiness. *Id.* at 1228. Significantly, the dissent noted that despite the fact that the state may mandate laws regulating the parties and the procedure for entering into a marriage, the reasons for and the manner in which a marriage may be terminated, "the statutes are silent regarding additional legal obligations of one spouse to the other. Our legislature has not been seen fit to bestow a legal right on either partner to any quantum of love, devotion, companionship or commitment from the other. . . . Possibly, our legislature recognizes that *commitment* to the married state must be generated by the individual and cannot be enforced by law." *Id.* at 1228.

Therefore, in our society, which recognizes husbands and wives as separate individuals, which recognizes that devotion and commitment are personal and perhaps moral obligations but not legal obligations, which refuses to recognize a cause of action by one spouse against the other for failure to love, there is no ground in law or logic for recognizing a cause of action by one spouse against a third party to whom the other spouse has voluntarily transferred his affections.

*Id.* at 1229.

The supreme courts of five states, while retaining the actions on the ground that abolition is a consideration best left to the legislature, view the actions with some disfavor. *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E. 2d 690 (1980) (alienation actions are disfavored); *Gorder v. Sims*, 306 Minn. 275, 237 N.W. 2d 67 (1975) (absent legislative declaration, no urgency in abolishing alienation action); *Dube v. Rochette*, 110 N.H. 129, 262 A. 2d 288 (1970) (alienation action susceptible to abuse, but legislative determination to retain the action must be respected); *Kremer v. Black*, 201 Neb. 467, 268 N.W. 2d 582 (1978) (criminal conversation retained); *Felsenthal v. McMillan*, 493 S.W. 2d 729 (Tex. 1973) (court declined to abolish criminal conversation

as it was part of the common law adopted by the Texas legislature). *See also Thompson v. Chapman*, 93 N.M. 356, 600 P. 2d 302, *cert. denied*, 92 N.M. 675, 593 P. 2d 1078 (N.M. Ct. App. 1979) (alienation action would be abolished if the court had authority to do so). The legislative response to *Gorder* in Minnesota and to *Felsenthal* in Texas was abolition of both heart balm actions in the former, and abolition of the action for criminal conversation in the latter. *See* Minn. Stat. Ann. § 553.02 (West Supp. 1984) and Tex. Fam. Code Ann. § 4.05 (Supp. 1984).

### E

The foregoing discussion reveals a slow but unmistakable trend away from allowance of suits for both alienation of affections and criminal conversation. Unarguably, the integrity of the marriage relation and the preservation of marital harmony are interests deserving of judicial protection. Yet, we find general agreement among the authorities who have examined the issue that, on balance, the social harm engendered by the existence of these torts and the actual counterproductive effect of the actions on a marriage outweigh the meritorious goals purportedly served by the actions. We find the reasons advanced by the majority of judicial authorities, commentators, and state legislatures for the abolition of these actions to be well-founded and convincing. Taken together, they point unerringly to the conclusion that these torts must also be abolished in this jurisdiction.

Certainly, situations exist where a genuine wrong has been committed and the plaintiff spouse has suffered injuries which are bona fide and severe. However, in determining whether the actions further equity for individuals, equity to the plaintiff is not the only consideration. The adverse results caused to defendants and third parties must also be taken into account. The peculiar susceptibility of these actions to abuse and the disproportionate publicity occasioned by the connotation of sexual misbehavior pose significant inequities to defendants and other family members. The potential damage to reputations, and the threat to sue can easily become, in effect, schemes of extortion and blackmail. These abuses are likely to be especially prevalent in divorce settlements where the threat of suit may serve as a powerful leverage for the potential plaintiff in obtaining a disproportionate share of the marital property. The threat of public scandal that

can be engendered by the filing of these causes of action was a major consideration behind the initial legislative movement to abolish the actions and there is no reason to believe the problem is any less prevalent today.

Furthermore, granting that the marriage relation is deserving of society's protection, the efficacy of the actions as a "preservative" has never been documented. Rather, the very institution of the lawsuit would seem likely to destroy any remaining marital harmony through the notoriety of marital failure and the stresses of litigation. Just as the availability of the actions is unlikely to actually preserve marital harmony, it is also unlikely to deter potential defendants from becoming romantically or sexually involved with married persons. Undoubtedly, as has been observed, in the usual case the conduct occurs without preconceived design, rendering the deterrent effect improbable.

Apart from considerations of utility, we are persuaded that the very theory of recovery underlying both actions is without basis in contemporary society. The above actions have never fully shaken free from their property-based origins, as evidenced by fact that the consent of the participating spouse to the offending conduct, or even his or her initiation of it, will not bar the suit. Yet, unarguably, spousal love and all its incidents do not constitute property that is subject to "theft" or "alienation."

It must be emphasized that we in no manner condone extramarital relationships or sexual promiscuity. However, we fully agree with the prevailing judicial view that because neither the statutory nor the common law imposes any obligation on married persons to maintain love or affection for each other, there is no ground in law or logic for recognizing a cause of action by one spouse against a third party to whom the other spouse has either voluntarily transferred his or her affections, or with whom he or she has chosen to engage in consensual sexual relations.

Our Supreme Court employed similar reasoning to deny a cause of action to some children against a third party for damages for alienation of their mother's affections in *Henson v. Thomas*, 231 N.C. 173, 56 S.E. 2d 432 (1949). The court stated that the issue before it was whether children, acting through their father as next friend, may maintain an action against a third party for damages for wrongfully disrupting the family circle and thereby

depriving them of the affection, companionship, guidance and care of their parents. In answering the question in the negative, the Court noted that with few exceptions, the common law provided no remedy for the loss of familial benefits in recognition of the fact that the "mutual advantages, privileges, and responsibilities of members of the family circle were deemed social rather than legal." *Id.* at 174, 56 S.E. 2d at 433.

The Court distinguished the husband's common law rights of action for criminal conversation with, and the alienation of the affections of, his wife as those actions were "grounded on the common law conception of the husband's property right in the person of his wife." *Id.* at 174, 56 S.E. 2d at 433. Finding no corresponding source of legal rights for the children in the affection and care of their mother, the Court declined to recognize the children's right to maintain such actions.

> The demurrer admits that plaintiffs have been deprived of the companionship, guidance, love and affection of their mother. This was brought about by the act of the mother in withdrawing these incidents of family life from them. In so doing she committed no legal wrong for which redress may be had in a court of law.
>
> A child may expect its mother to make these contributions to the home and confidently anticipate that she will ever maintain and preserve her chastity. . . . These are matters within her keeping. The measure of their contribution is controlled by her willingness and capacity.
>
> *Since the mother, who is a free agent, committed no legal wrong for which redress may be had in a court of law, it cannot be said that the defendant, who allegedly induced her to be remiss in her domestic duties, incurred any greater liability than the law attaches to her act.*
>
> To hold otherwise would mean that every time a person persuades or induces a mother to engage in other activities to such an extent as to cause her to neglect her children, he commits a tort for which he may be compelled to respond in damages. . . . (Emphasis added.)

*Id.* at 175, 56 S.E. 2d at 433-34. In concluding, the Court stated that, "It is not for the courts to convert the home into a commer-

cial enterprise in which each member of the group has a right to seek legal redress for the loss of its benefits." *Id.* at 176, 565 S.E. 2d at 434. *See also* 3 Lee, N. C. Family Law, § 244, p. 256 (1981).

Surely the mother or wife can be considered no less of a "free agent" with regard to her capacity or willingness to contribute conjugal love and affection to her relationship with her husband, and vice-versa. Although adultery remains a criminal offense in North Carolina, G.S. 14-184, we find no compelling reason to retain, in addition, a remedy of money damages for the same conduct. No longer do the courts of this State subscribe to the concept that one spouse possesses *property rights* to either "the body" or the "mind, unpolluted," of his or her spouse. *See Sullivan v. Valiquette, supra.* We find that today the concept that one person possesses legally cognizable rights to the feelings or mental attitude of another is inherently offensive. There remains, therefore, no better reason for the courts to convert the home into a commercial enterprise in the context of interpersonal spousal relations than in the context of parent-child relations.

Moreover, continued recognition of these torts is incompatible with the modern conception of the marital couple "not [as] an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup." *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed. 2d 349, 362 (1972). "[Marriage] is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed. 2d 510, 516 (1965). Within the concept of marriage as a consensual association of autonomous individuals, a voluntary "bilateral loyalty," there is no longer any room for liability premised upon the lack of free will on the part of the spouse seeking emotional or intellectual fulfillment outside the marriage. Nor is there room for the provision of compensatory and punitive damages for the voluntary withdrawal of the benefits of love, affection and companionship from the marriage by one spouse. The detrimental effect of these actions on the privacy and autonomy interests of married persons, coupled with the many deleterious social effects of these actions as noted in Part II, C and D of this opinion, simply outweighs any possible gains in the

direction of marital harmony to be derived from retention of the actions.

We find no inconsistency with this conclusion and the rule in this jurisdiction that a spouse may maintain a cause of action for loss of consortium due to the negligent actions of a third party so long as that action for loss of consortium is joined with any suit the other spouse may have instituted to recover for his or her own personal injuries. *See Nicholson v. Hospital*, 300 N.C. 295, 266 S.E. 2d 818 (1980). In such an action the underlying liability is established in the personal injury action; loss of consortium represents only an element of the damages recoverable. There, the real basis of recovery is the injured spouse's diminished or destroyed ability and physical capacity to render the marital rights of consortium, "society, companionship, comfort and affection," including sexual relations, 300 N.C. at 297, 266 S.E. 2d at 819, to the plaintiff spouse. *See Hinnant v. Power Co.*, *supra* at 124, 126 S.E. at 310. This diminished or destroyed *capacity* to render the mutual rights of consortium stands in sharp distinction with the changed disposition of the mind of one spouse towards the other, and the consequent diminished or destroyed *willingness* to perform the conjugal duties encompassed by the concept of consortium in the context of the alienation of affections or criminal conversation actions.

## F

We act with regard to the "heart balm" torts fully cognizant of the need for caution with regard to rules affecting marriage, home and family relationships. However, we also act with regard to our duty to the common law tradition.

> It is not only the right, but the duty of the courts to re-examine questions when justice demands it, and to depart from or modify old rules when necessary to bring the law in accord with present-day standards of wisdom and justice [and] to adapt their practice and course of proceeding as far as possible to the existing state of society. . . .

1 Am. Jur. 2d, Actions, § 49, p. 582. A common phenomenon in the development of the common law is the substitution of new reasons for the maintenance of a well-established rule long after the conditions which gave rise to it have disappeared, and ex-

perience suggests the need for change. *See* Holmes, *The Common Law*, p. 5 (1881). *See also Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed. 2d 186 (1980).

> This was recognized in [*Funk v. United States*, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933)] where the Court "decline[d] to enforce . . . ancient rule[s] of the common law under conditions as they now exists." . . . For, as Mr. Justice Black admonished in another setting, "[w]hen precedent and precedent alone is all the argument that can be made to support a court-fashioned rule, it is time for the rule's creator to destroy it." . . . (Citations omitted.)

*Id.* at 48, 100 S.Ct. at 911, 63 L.Ed. 2d at 193. We agree with the Supreme Court of Pennsylvania in *Fagden v. Lenkner*, 365 A. 2d at 152, that in the case of heart balm torts, the doctrine of *stare decisis*, which advances precedent for the sake of certainty, must give way to new conditions and to the persuasion of superior reasoning.

In contrast to those courts declining to abolish the "heart balm" torts in deference to legislative action on the matter, we find ample precedent in this jurisdiction for judicial abolition of these causes of action. It is well settled that absent a legislative declaration, the courts possess the authority to alter judicially created common law rules when such action is deemed necessary in light of experience and reason. *Mims v. Mims*, 305 N.C. 41, 55, 286 S.E. 2d 779, 788 (1982) (equalization of presumption of gift in interspousal property conveyances); *State v. Freeman*, 302 N.C. 591, 276 S.E. 2d 450 (1981) (common law rule rendering spouses incompetent to testify against each other in a criminal proceeding judicially altered); *Nicholson v. Hospital, supra* (recognition of cause of action for spouse's loss of consortium when joined with personal injury action); *Rabon v. Hospital*, 269 N.C. 1, 152 S.E. 2d 485 (1967) (abolition of charitable immunity for public hospitals); *Hutchens v. Hankins*, 63 N.C. App. 1, 303 S.E. 2d 584, *disc. rev. denied*, 309 N.C. 191, 305 S.E. 2d 734 (1983) (recognition of cause of action for selling or serving alcoholic beverages to visibly intoxicated tavern patrons). It is equally well settled that in the event that an application of a common law rule cannot achieve its aim, then adherence to precedent becomes the only justification in support of the rule, and the courts are compelled to re-examine

the common law doctrine. *Trammel v. United States, supra; State v. Freeman, supra* (privilege against adverse spousal testimony modified so that the witness spouse alone has privilege to refuse to testify).[14]

A review of the historical and theoretical bases of the actions, and the largely unsuccessful attempts to articulate a convincing modern basis for the "heart balm" torts lead us to conclude that there is no continuing legal basis for the retention of these tort actions today. They protect no interests and further no public policies not better served by other means, and the potentialities for abuse posed by their existence outweigh any possible benefits to be obtained by their retention in contemporary society. While the historical remedies allowed by these causes of action have undergone some progressive changes through the years, the actions remain permeated with the uncultivated and obsolete ideas which marked their origin. We hold that the causes of actions of alienation of affections and criminal conversation are hereby abolished in this jurisdiction.

Although we find that the trial court erroneously granted summary judgment for defendant on the ground that there was no genuine issue of fact upon either cause of action, we affirm summary judgment for defendant in view of our abolition of the two "heart balm" causes of action in this jurisdiction.

Affirmed.

Judges WELLS and BECTON concur.

---

14. In both *Trammel* and *Freeman,* the spousal testimonial privilege in criminal proceedings was judicially modified in recognition of two facts. First, the doctrines originally giving rise to the privilege, the common law concepts that the wife was regarded as the chattel of her husband with no separate legal identity, and the accused's disqualification from testifying on the grounds of his interest in the action, were no longer legally viable. Second, the contemporary justification for affording an accused such a privilege, the protection and promotion of marital harmony, was found to be unpersuasive and outweighed by the public interest in ascertaining the truth.